**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **LORI PANDIT,**<br>***Plaintiff,***<br><br>**v.**<br><br>**TEMPLE UNIVERSITY,**<br>***Defendant.*** | **Civil No. 24-1475** |

**MEMORANDUM**

**COSTELLO, J.** **August 14, 2026**

Plaintiff Lori Pandit is a former Doctor of Dental Medicine ("DMD") student at Temple University's Kornberg School of Dentistry. She was dismissed from the program because she failed multiple classes. Following her academic dismissal from the program, Plaintiff brought this action against Temple University, Associate Dean Maria Fornatora, and Dean Amid Ismail (collectively, "Defendants") under 42 U.S.C. § 1983 for violations of the Fourteenth Amendment, and under Title II of the Americans with Disabilities Act ("ADA"). Plaintiff alleges that Defendants violated her due process rights before and during the academic dismissal process. She further alleges disability discrimination under the ADA, contending that her dismissal was driven by discriminatory animus. Defendants have moved for summary judgment on all claims. For the reasons that follow, the Court will grant Defendants' motion.

## I. BACKGROUND

Plaintiff was enrolled in the professional Doctor of Dental Medicine ("DMD") program at Temple's School of Dental Medicine from 2021 to 2023, during which time she struggled academically. During Plaintiff's enrollment, Associate Dean Maria Fornatora was the Associate

Dean of Academic Affairs and served as the Chair of the Student Appeals Committee. ECF No. 30-26 at 4. Dean Amid Ismail was the Dean of the DMD program. ECF No. 30-28 at 4.

The claims in this case center on three primary topics: (1) the academic standards and procedures set forth in the DMD Student Handbook, (2) Plaintiff's academic performance and her disability accommodations, and (3) the process that culminated in Plaintiff's dismissal.

### A. The DMD Student Handbook, Policies, and Regulations

The DMD regulations explicitly "govern academic administration of the DMD program of the Temple University Kornberg School of Dentistry . . . in all pre-doctoral tracks." ECF No. 30-12 at 78. On August 20, 2021, Plaintiff signed a formal acknowledgment stating that she received, read, and understood the information in the DMD handbook, including the policies and procedures of Temple University and the Kornberg School of Dentistry. ECF No. 30-13 at 1.

The academic regulations for the DMD program, which are appended to the DMD student handbook, require a student to maintain a 2.0 grade point average ("GPA") and pass all required courses with a grade of "C" or higher to remain in good academic standing. ECF No. 31 ¶ 47. A student who fails to meet these standards is subject to an "unfavorable promotions decision." *Id.* ¶ 53. "An unfavorable promotions decision means a student may be 1) dismissed from the DMD program; 2) directed to repeat an entire year; or 3) placed on academic probation and afforded an opportunity to achieve a satisfactory grade for the course(s) through remediation." *Id.*

In the spring semester of her first year, Plaintiff failed the gross anatomy course. ECF No. 30-25 at 70. As a result, she was not in good academic standing at the beginning of the summer semester. ECF No. 31 ¶ 67. The Student Promotions Committee ("SPC") voted to allow Plaintiff to remediate the anatomy course, meaning that she could study the material and

take the exams again. *Id.* ¶¶ 69-72. The DMD regulations explain that course remediation is an opportunity for a student to achieve a satisfactory grade for the course. ECF No. 30-12 at 82. A student who is eligible for remediation "must contact the course director in a timely fashion to begin the remedial process." *Id.* at 83. Successful course remediation is required for a student to progress from one academic year to the next. *Id.* During the summer semester, before Plaintiff remediated her anatomy grade, she failed a course in inflammation and wound healing. ECF No. 31 ¶ 73. Plaintiff finished her first year with a 1.95 GPA. *Id.* ¶ 9.

The SPC met in July 2022 to review Plaintiff's status for promotion. *Id.* ¶ 76. Seven of the eleven course directors voted to direct Plaintiff to repeat the first year. *Id.* ¶ 77. The other four directors voted for her dismissal. *Id.* Plaintiff did not appeal the SPC's direction that she repeat the first year. *Id.* ¶¶ 81-83. Students repeating a year are required to retake all courses in which they previously earned a grade of "B" or lower. *Id.* ¶ 57. DMD Regulations provide that "grades from the repeated courses are used to compute the [GPA]." ECF No. 30-12 at 84. Accordingly, while the grades from Plaintiff's first year would remain on her transcript, the grades from Plaintiff's second attempt at any first-year courses would be used to compute her GPA. *Id.*

**B. Plaintiff's Repeat Year and Disability Accommodations**

Plaintiff began her repeat year in the fall of 2022. She did not have a full course load in either the fall 2022 or summer 2023 semesters. ECF No. 31 ¶¶ 84, 94. Plaintiff's course load was lighter during these semesters because she was not required to repeat classes in which she earned an "A" during her first year. *Id.* Thus, Plaintiff had one less class than other students during each of these semesters. *Id.* In addition, Plaintiff requested and received accommodations from Temple for anxiety and ADHD. *Id.* ¶¶ 141, 143. Specifically, Temple

agreed to provide Plaintiff with 1.5x testing time and a distraction-reduced environment for test-taking. *Id.* ¶¶ 143, 145-48.

Despite these accommodations and a reduced course load, Plaintiff's performance did not significantly improve. In the fall 2022 semester, Plaintiff failed the biochemistry course and did not dispute her grade. *Id.* ¶¶ 85-86. The SPC voted unanimously to require Plaintiff to remediate the course, but she failed to do so. *Id.* ¶¶ 89-90. Likewise, in the summer 2023 semester, Plaintiff failed the cranial growth and cephalometrics course and again did not dispute the failing grade. *Id.* ¶ 95. Plaintiff finished her repeat year with a 2.28 GPA, while the average for her peers was 3.17. *Id.* ¶¶ 97-98. Although her GPA was above 2.0, Plaintiff was not in good academic standing due to her failure to pass all required courses. *See id.* ¶ 47.

### C. The SPC Recommendation, Plaintiff's Appeal, and Ultimate Dismissal

Following these failures, the SPC met on July 5, 2023, and unanimously recommended dismissing Plaintiff from the program. *Id.* ¶ 99. Associate Dean Fornatora advised Plaintiff of the SPC's decision by letter that same day. ECF No. 30-20 at 2. Plaintiff appealed the recommendation and submitted a twenty-three-page letter to the Student Appeals Committee ("SAC"). ECF No. 31 ¶¶ 100, 105. The SAC is comprised of faculty who do not serve on the SPC. The SAC therefore serves as a "clean slate" for appeals. *Id.* ¶ 60.

On July 12, 2023, the SAC held a hearing. *Id.* ¶ 126. During the hearing, Plaintiff had an opportunity to raise any concerns regarding the fairness of the proceedings. *Id.* ¶ 131. Plaintiff also had an opportunity to address the committee and to respond to questions from members of the SAC. *Id.* ¶¶ 129-130. Among other things, Plaintiff complained that she experienced some difficulty with her accommodations. ECF No. 30-21 at 13-14. Plaintiff claimed, among other things, that test proctors made some "disparaging remarks." *Id.* Plaintiff later explained these

remarks during her deposition. Plaintiff claimed that on some test days, Plaintiff's testing group experienced confusion regarding their testing location, and on "one or two" of these occasions, an unidentified proctor made a comment to the effect of "it's not a big deal, why are people so worried." ECF No. 30-25 at 33-37. These remarks did not help Plaintiff deal with her nervousness and, in fact, "made things significantly more difficult." *Id.* at 35-36.

In addition, Plaintiff complained to the SAC about the calculation of her GPA, arguing that between her two academic years, she passed all the required courses. ECF No. 30-21 at 11-12. Associate Dean Fornatora advised Plaintiff that her argument as to her GPA incorrectly relied on policies that applied to undergraduates and that the decision for her dismissal related to the specific academic regulations of the dental school. *Id.* Plaintiff indicated that she understood the difference between the policies and stated that she was "trying to see if there was any flexibility in terms of giving [her] an opportunity that [she] felt that other people had also received."[1] *Id.* at 11.

Following the hearing, the SAC voted unanimously to recommend to Dean Ismail that Plaintiff be dismissed from the DMD Program. ECF No. 31 ¶ 133. Dean Ismail then conducted an independent review of the hearing transcript, hearing audiotape, and other materials from the

[1] Despite telling the SAC that she understood the difference between the policies and that she cited the undergraduate policy only "to see if there was any flexibility," Plaintiff nevertheless continued to maintain in this lawsuit that Temple incorrectly calculated her GPA. Plaintiff repeated her claim that a different policy (Temple University Policy 02.10.12 entitled "Repeating a Course (Undergraduate and Graduate)) applied to her and that her highest grade in each course across both academic years should have been used to calculate her GPA. This Court previously rejected Plaintiff's argument, explaining that this policy did not apply to Plaintiff as a DMD student. *Pandit v. Temple Univ.*, No. 24-1475, 2025 WL 388818, at *4 (E.D. Pa. Feb. 4, 2025). Instead, the specific DMD grading policy controlled. *Id.* As discussed above, the DMD policy explicitly stated that "grades from the repeated courses are used to compute the grade point average." ECF No. 30-12 at 84.

Office of Student Affairs. *Id.* ¶¶ 135-36. Finding no error, he notified Plaintiff that he was upholding her dismissal on July 17, 2023. *Id.* ¶ 136.

## II. LEGAL STANDARD

Summary judgment is appropriate if the movant shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "To defeat a motion for summary judgment, there must be a factual dispute that is both material and genuine." *Bennett v. SEPTA*, No. 23-1271, 2024 WL 404959, at *6 (E.D. Pa. Feb. 2, 2024), *aff'd sub nom.*, *Bennett v. Se. Pa. Transp. Auth.*, No. 24-1376, 2025 WL 1248815 (3d Cir. Apr. 30, 2025). A fact is material if it "might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" if, "based on the evidence, 'a reasonable jury could return a verdict for the nonmoving party.'" *Bennett*, 2024 WL 404959, at *6 (quoting *Anderson*, 477 U.S. at 248).

The movant bears the initial burden of demonstrating the absence of a genuine dispute of a material fact. *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016). "When the movant is the defendant, they have the burden of demonstrating that the plaintiff 'has failed to establish one or more essential elements of her case.'" *Bennett*, 2024 WL 404959, at *6 (quoting *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013)). "If Plaintiff fails to raise a genuine dispute of material fact as to any element of his prima facie case, summary judgment in favor of Defendant is warranted." *Hanafy v. Hill Int'l, Inc.*, 669 F. Supp. 3d 419, 433 (E.D. Pa. 2023) (citing *Geraci v. Moody-Tottrup, Int'l, Inc.*, 82 F.3d 578, 580 (3d Cir. 1996)).

The Court does not weigh evidence or make credibility determinations at the summary judgment stage. Rather, it simply determines "whether there is a genuine issue for trial." *Bennett*, 2024 WL 404959, at *6 (citing *Anderson*, 477 U.S. at 249). "The mere existence of a

scintilla of evidence in support of the plaintiff's position will be insufficient" to create a triable issue; "there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

## III. DISCUSSION

### A. Procedural Due Process Claims

Plaintiff's first two claims are procedural due process claims. ECF No. 40 at 4. Plaintiff alleges that Defendants failed to give her a proper pre-dismissal hearing or appeal and that she did not receive adequate notice of the grading policy that applied to her second attempt at the first-year curriculum. ECF No. 21 ¶ 10; ECF No. 40 at 8-9.

To succeed on a procedural due process claim under 42 U.S.C. § 1983, a plaintiff must establish: "(1) that [s]he was deprived of a protected liberty or property interest; (2) that this deprivation was without due process; (3) that the defendant subjected the plaintiff, or caused the plaintiff to be subjected to, this deprivation without due process; (4) that the [d]efendant was acting under color of state law; and (5) that the plaintiff suffered injury as a result of the deprivation without due process." *Borrell v. Bloomsburg Univ.*, 955 F. Supp. 2d 390, 402 (M.D. Pa. 2013) (quoting *Sample v. Diecks*, 885 F.2d 1099, 1113-14 (3d Cir. 1989)).

To determine whether a property interest exists for purposes of procedural due process, courts look to state law. *Borrell*, 955 F. Supp. 2d at 402 (citing *Dee v. Borough of Dunmore*, 549 F.3d 225, 229 (3d Cir. 2008)). "Courts in the Third Circuit have repeatedly recognized that a graduate student has a property interest protected by procedural due process in the continuation of his or her course of study under Pennsylvania law." *Borrell*, 955 F. Supp. 2d at 402 (collecting cases); *see also Manning v. Temple Univ.*, No. 03-4012, 2004 WL 3019230, at *8 (E.D. Pa. Dec. 30, 2004) (citing *Ross v. Pennsylvania State Univ.*, 445 F. Supp. 147, 152 (M.D.

Pa. 1978)). Accordingly, the Court assumes for the purpose of this motion that Plaintiff has a property interest in her continued enrollment for both of her procedural due process claims.

The parties' core dispute focuses on the second element: whether the procedure Defendants followed was sufficient to comport with due process. When a university dismisses a student for academic reasons, as opposed to disciplinary reasons, all that is required to satisfy procedural due process is "an informal faculty evaluation with the student." *Kadakia v. Rutgers*, 633 F. App'x 83, 88 (3d Cir. Dec. 3, 2025) (quoting *Mauriello v. Univ. of Med. & Dentistry of N.J.*, 781 F.2d 46, 51 (3d Cir. 1986)). A student is entitled to only an "informal give-and-take" with the administration so that she may "characterize [her] conduct and put it in what [she] deems the proper context." *Bd. of Curators of the Univ. of Mo. v. Horowitz*, 435 U.S. 78, 85-86 (1978). Based on the record evidence, there is no genuine dispute that Plaintiff received appropriate process in connection with her dismissal.

i. <u>The Pre-Dismissal Hearing and Appeal</u>

With respect to the procedures provided, Plaintiff fails to point to sufficient record evidence from which a jury could reasonably find that her academic dismissal occurred without due process. As detailed above, *supra* at 4, Plaintiff was given opportunities to contest her grades. She submitted a comprehensive twenty-three-page appeal letter and addressed the SAC during a formal hearing. Dean Ismail then conducted an independent review before dismissing Plaintiff. This multi-layered review and opportunity to be heard far exceeds the "informal faculty evaluation" required for academic dismissals. *See Knowles v. Temple Univ.*, No. 21-3131, 2022 WL 3037258, at *3 (3d Cir. Aug. 2, 2022) (affirming grant of summary judgment as a matter of law after the Magistrate Judge found that Temple satisfied due process by reviewing the plaintiff's multiple grievances and hearing appeals after failed exams).

Perhaps knowing this, Plaintiff is no longer contesting the process related to the SPC, SAC appeal, or Dean Ismail's review. ECF No. 40 at 13-14. Instead, Plaintiff argues that she was entitled to notice and an opportunity to respond before the SPC initially recommended her dismissal. ECF No. 34 at 10. This argument is unavailing. By the time the SPC recommended dismissal, Plaintiff had failed four classes, had the opportunity to dispute each grade, and failed to remediate the courses. Moreover, the recommendation of dismissal remained subject to multi-tiered review and modification as discussed above. Plaintiff has not—and cannot—cite any legal authority for her argument that a student is entitled to notice and an opportunity to respond before a preliminary committee recommends dismissal related to academic performance. Even if the Court applied the more rigorous standard reserved for disciplinary dismissals, Plaintiff would be entitled to notice and an opportunity to respond only before a final deprivation occurs, not before a preliminary committee recommendation that remains subject to multi-tiered review and modification. *See Horowitz*, 435 U.S. at 85-86.

Because there was no deprivation without due process on the record presented here, Plaintiff cannot satisfy the elements of her procedural due process claim related to pre-dismissal proceedings. Accordingly, the Court will grant Defendants' motion for summary judgment on that claim.

ii. Notice of the Applicable Grading Policy

Plaintiff's second argument that Defendants violated her procedural due process rights by failing to give her notice of the applicable grading policy for repeated courses fails for two reasons. First, it relies on a fundamental misunderstanding of what notice requires in this context. Second, the record evidence contradicts Plaintiff's claim that she was unaware of the applicable policy.

Plaintiff asks the Court to read a notice requirement into the law that does not exist. In the context of a student suspension for disciplinary reasons, due process requires only "that the student be given oral or written notice of the charges against him." *Goss v. Lopez*, 419 U.S. 565, 581 (1975). In academic dismissal cases, such as this, the law requires even less.

The United States Supreme Court has held that a student's prior knowledge of the faculty's dissatisfaction with her performance along with careful, deliberate decision-making satisfied due process without the need for more formal procedures. *Horowitz*, 435 U.S. at 85-86. In applying this framework, the Third Circuit has held that a student receives appropriate notice to satisfy due process if she is aware that her academic standing or continuation in a program is in jeopardy. *See Mauriello*, 781 F.2d at 47, 51 (finding dental student had notice that her continuation in the program was in jeopardy well before her ultimate dismissal when a faculty member withdrew as her advisor due to unsatisfactory progress); *Hankins v. Temple Univ.*, 829 F.2d 437, 445 (3d Cir. 1987) (finding sufficient notice where a student knew that her continued participation in the program was in jeopardy after she was informed of performance deficiencies months before her suspension). Thus, there is no due process violation if a student receives notice of academic deficiency, faculty dissatisfaction, or that the student's continued enrollment is in jeopardy, all of which occurred here. *See Horowitz*, 435 U.S. at 85-86; *Mauriello*, 781 F.2d at 51; *Hankins*, 829 F.2d at 445. Plaintiff argues that procedural due process also requires Temple to have notified Plaintiff that the undergraduate and graduate grading policy that is not part of the DMD regulations did not apply to her. There is simply no legal support for Plaintiff's argument.

In any event, Plaintiff clearly had notice that the DMD handbook, regulations, and policies applied to her as a student in the DMD program. The introduction to the DMD

handbook notes that it provides "students and residents with a source for policies, procedures, and resources relevant to the Temple University Kornberg School of Dentistry Dental programs in the Doctor of Dental Medicine (DMD) degree[.]" ECF No. 30-12 at 8. The DMD regulations—which Plaintiff acknowledged receiving—also explicitly state that the policies set forth therein "govern academic administration of the DMD program of the Temple University Kornberg School of Dentistry . . . in all pre-doctoral tracks." *Id.* at 78; ECF No. 30-13 at 2. The specific policies regulating repeating years and grading calculations during repeat years are contained within those regulations. Plaintiff testified that she had access to the DMD handbook during her repeat year and understood from each person she talked to that she would have to pass every course in her repeat year, regardless of her prior grades. ECF No. 30-25 at 77-78, 87.

Plaintiff nonetheless argues that Article I of the DMD bylaws supports her position. Article I states that in "the event of any conflict or contradiction between any bylaw of the School of Dentistry or any action taken by the School under the authority of its bylaws and any University Policy now in effect or adopted in the future such bylaw or the action taken shall be superceded by the pertinent University Policy." ECF No. 40 at 18-19; ECF No. 13-3 at 2. Plaintiff argues that Article I could be read to suggest that the more favorable undergraduate and graduate policy applied to her. This argument is unpersuasive.

Plaintiff's construction ignores the explicit, operative language found in the DMD handbook and regulations outlined above. A general bylaw cannot be read to displace the specific regulations that apply to students in the DMD program. Furthermore, Plaintiff identifies no actual contradiction that would trigger Article I. The DMD regulation unambiguously explains that grades from the repeat year are used to calculate GPA. ECF No. 30-12 at 84.

Because the DMD policy is clear and unambiguous, Plaintiff's reliance on Article I does not create a genuine dispute of material fact.

Because Plaintiff received adequate notice that her continued participation in the program was in jeopardy, and because she had actual notice of the DMD program policies governing her repeat year, no jury could reasonably find a deprivation of procedural due process.

**B. Substantive Due Process**

While Plaintiff characterized her claims as violations of procedural due process, she repeatedly referred to Defendants' conduct as arbitrary, which traditionally suggests a substantive due process claim. ECF No. 34 at 11, 14. The Third Circuit has "strongly suggested that the right to continued graduate education is not protected by substantive due process." *Manning v. Temple Univ.*, 157 F. App'x 509, 514 (3d Cir. 2005) (quoting *Mauriello*, 781 F.2d at 50). Even assuming that such a right exists, the evidence here does not support Plaintiff's argument that her dismissal resulted from an arbitrary and deliberate abuse of authority.

When courts are asked to review a "genuinely academic decision . . . they should show great respect for the faculty's professional judgment." *Mauriello*, 781 F.2d at 50 (quoting *Ewing*, 474 U.S. at 225). Indeed, a court may not override the faculty's professional judgment "unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Id.* If the university's decision is not "beyond the pale of reasoned academic decision-making," any substantive due process claim fails. *Manning*, 157 F. App'x at 515 (quoting *Ewing*, 474 U.S. at 227-28).

There is no record evidence to suggest that Temple's decision-making was outside the bounds of professional judgment. The record reflects that Defendants' dismissal decision was

based on Plaintiff's poor academic performance. Over the course of two academic years, Plaintiff failed multiple classes and failed to either dispute or successfully remediate her grades. ECF No. 31 ¶¶ 64-65, 73-74, 85-86, 89-90, 95. Furthermore, during her second attempt at the first-year curriculum, Plaintiff received accommodations and carried fewer classes than her peers. *Id.* ¶¶ 84, 94, 144-45. Yet, she continued to fail classes and struggle academically. *Id.* ¶¶ 85, 95. As the Third Circuit has made clear, summary judgment is appropriate despite a student's claims of institutional or faculty unfairness when the record demonstrates that the dismissal was ultimately based on numerous failing grades. *See Manning*, 157 F. App'x at 515.

In any event, Defendants' ultimate decision to dismiss Plaintiff was not arbitrary or capricious. As discussed above, *supra* at 4-5, Temple's decision to dismiss Plaintiff was the result of a deliberate, multi-layered review of her academic performance and deficiencies. Because Defendants' decision falls squarely within the bounds of reasoned academic decision-making, any substantive due process claim fails as a matter of law.

**C. Due Process Claims against Associate Dean Fornatora and Dean Ismail**

In Counts IV and V, Plaintiff alleged individual due process claims against Associate Dean Fornatora and Dean Ismail. Plaintiff asserts that their participation in her dismissal violated her due process rights. These claims fail because the individual defendants are entitled to qualified immunity.

"Qualified immunity provides a defense for government officials 'performing discretionary functions' so long 'as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Furey v. Temple Univ.*, 884 F. Supp. 2d 223, 260 (E.D. Pa. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). If a plaintiff fails to establish an underlying constitutional violation, the qualified

immunity inquiry ends, and the individual defendants are entitled to judgment as a matter of law. *Bennett v. Murphy*, 274 F.3d 133, 136 (3d Cir. 2001).

i. Associate Dean Fornatora

Plaintiff argues that summary judgment is precluded by issues of material fact regarding Associate Dean Fornatora's role in ensuring procedural fairness. ECF No. 34 at 13-14. This argument fails because the record reflects no evidence of a constitutional violation. First, Plaintiff has not pointed to any evidence in the record indicating that Associate Dean Fornatora failed to exercise professional due diligence before signing the dismissal letter. Second, as established *supra*, the multi-layered notice and extensive hearing procedures Plaintiff received exceeded the constitutional baseline required for academic dismissals. Because Associate Dean Fornatora's execution of the dismissal decision did not violate any constitutional standard—let alone a clearly established one—she is entitled to qualified immunity.

ii. Dean Ismail

Plaintiff makes similar arguments with respect to Dean Ismail. She argues that he failed to exercise due diligence when reviewing her administrative appeal, failed to issue a detailed explanation for his decision, and failed to address her purported due process grievances. ECF No. 21 ¶¶ 48-49. The record contradicts these assertions. The undisputed evidence demonstrates that Dean Ismail conducted a thorough, independent review of the administrative record before upholding the SPC and SAC's recommendation. ECF No. 31 ¶¶ 135-36. Furthermore, Plaintiff has not pointed to any authority to support the notion that a university dean violates due process by affirming a legally sufficient, multi-tiered academic dismissal without drafting an exhaustive written opinion. Because Plaintiff cannot establish an underlying constitutional injury resulting from Dean Ismail's review, he is also entitled to qualified immunity.

iii. Grading Policy Notice

Finally, to the extent Plaintiff contends that both Associate Dean Fornatora and Dean Ismail violated her due process rights by failing to apply the generalized undergraduate and graduate grading policy to her repeat academic year, her argument fails as a matter of law. This Court has already determined that the undergraduate and graduate grading policy is inapplicable to her as a student enrolled in the DMD program. There is no clearly established constitutional right requiring a university administrator to apply a grading policy that is inapplicable to a student's specific degree program. In managing Plaintiff's academic standing, Associate Dean Fornatora and Dean Ismail followed the protocols set forth in the DMD handbook and regulations which governed her enrollment. Because Plaintiff cannot demonstrate that the conduct of either individual defendant violated a clearly established constitutional right of which a reasonable person would have known, Associate Dean Fornatora and Dean Ismail are entitled to qualified immunity. Accordingly, the Court will grant Defendants' motion for summary judgment as to Counts IV and V.

**D. Disability Discrimination**

In Count III, Plaintiff alleges disability discrimination under the ADA. ECF No. 21 at 6-7. As an initial matter, to the extent Plaintiff asserts an ADA claim against Associate Dean Fornatora and Dean Ismail in their individual capacities, those claims fail as a matter of law. Title II of the ADA applies exclusively to public entities, and individual employees or administrators cannot be held liable in their personal capacities under the statute. *See*, *e.g.*, *Emerson v. Thiel Coll.*, 296 F.3d 184, 189 (3d Cir. 2002); *Anderson v. Kauffman*, No. 22-cv-00226, 2023 WL 1805837, at *6 (M.D. Pa. Feb. 7, 2023), vacated on other grounds, No. 24-

2932, 2026 WL 1397313 (3d Cir. May 19, 2026). Therefore, summary judgment is warranted as to the individual defendants.

To establish a violation of the ADA as to Temple, Plaintiff must demonstrate that she: "(1) has a disability; (2) was otherwise qualified to participate in a school program; and (3) was denied the benefits of the program or was otherwise subject to discrimination because of her disability." *Rey v. Univ. of Pittsburgh Sch. of Dental Med.*, 182 F. Supp. 3d 282, 296-97 (W.D. Pa. 2016). Defendants do not dispute that Plaintiff has a disability. ECF No. 30 at 20. The parties primarily dispute the second element—whether Plaintiff was otherwise qualified to participate in the program.

"An otherwise qualified individual is a person who can meet all of a program's requirements in spite of a disability, with or without reasonable accommodation." *Millington v. Temple Univ. Sch. of Dentistry*, 261 F. App'x 363, 366 (3d Cir. 2008) (citing *Southeastern Cmty. Coll. v. Davis*, 442 U.S. 397, 406 (1979)). In evaluating whether a student is academically qualified, courts must "show great respect for the faculty's professional judgment."[2] *Chin v. Rutgers*, 697 F. App'x 751, 754 (3d Cir. 2017) (quoting *Ewing*, 474 U.S. at 225). Courts are ill-equipped to second-guess the academic standards of professional schools. *See Ewing*, 474 U.S. at 225–26; *see also Horowitz*, 435 U.S. at 92.

Applying this deferential standard here, no jury could reasonably find that Plaintiff was otherwise qualified to participate in the DMD program. Despite receiving a reduced course load and testing accommodations, Plaintiff's academic failures persisted across multiple semesters. Plaintiff is similar to the dental student in *Millington*, where the Third Circuit affirmed summary

[2] This standard originated in the substantive due process context, *see Ewing*, 474 U.S. at 225, but the Third Circuit has referenced this deference to evaluate whether a student is "otherwise qualified" for an ADA claim. *See Chin*, 697 F. App'x at 754-55 (citing *Ewing*, 474 U.S. at 225).

judgment because the plaintiff "struggled academically from the inception of her dental studies." 261 F. App'x at 366. In *Millington*, the student routinely faced academic probation and her performance failed to improve even after the university accommodated her disability—going so far as to provide a dental assistant for clinical duties. *Id.* Here, as in *Millington*, Plaintiff was given institutional support and accommodations, but she simply could not meet the rigorous academic standards of the DMD program. Accordingly, Plaintiff cannot establish that she was otherwise qualified for the DMD program.

Even if the record evidence established that Plaintiff was otherwise qualified, there is no evidence she was discriminated against because of her disability. Plaintiff asserts that testing logistics were confusing and that a university proctor made disparaging remarks about her disability. ECF No. 34 at 13. More specifically, Plaintiff testified that during instances of confusion regarding testing locations, an unidentified proctor commented that "it's not a big deal, why are people so worried." ECF No. 30-25 at 35. These comments were made on "one or two" occasions. *Id.* at 37. Plaintiff claimed that these comments did not "really help the situation." *Id.* at 36. Claiming that the comments and confusing logistics "did not help" is insufficient to establish discrimination. There is no evidence that the comments, or for that matter confusion over testing locations, constitute a failure to accommodate, negatively impacted Plaintiff's performance, or caused her dismissal from the DMD program. The record evidence establishes instead that Defendants granted the accommodations Plaintiff requested, and she struggled academically, nonetheless. On this record, no reasonable jury could find that Plaintiff was denied the benefits of the DMD program because of her disability. Accordingly, the Court will grant Defendants' motion for summary judgment as to Count III.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted in its entirety. Plaintiff's pre-dismissal proceedings and the actual notice she received of the applicable grading policy satisfied procedural due process. Any alternative substantive due process claim fails because her dismissal was a non-arbitrary reflection of her academic performance. Additionally, because no underlying constitutional violation occurred, Associate Dean Fornatora and Dean Ismail are entitled to qualified immunity. In addition, Associate Dean Fornatora and Dean Ismail are not subject to Plaintiff's ADA claim. Finally, Plaintiff's ADA claim fails against Temple because Plaintiff was not an otherwise qualified student, and the record reflects no evidence that her performance-based dismissal was the result of discrimination. An appropriate Order will follow.

**BY THE COURT:**

MARY KAY COSTELLO, J.